This case is number 06-5016, Bluebonnet Savings bank account.  And without that concern, there's no basis in the record for the court to modify our expert's model. And in that connection, Dawko, again, seems to be right on point. In that case, the plaintiff demonstrated damages of about $8,000. The court, as a jury verdict, increased those damages from $8,000 to $500,000. The court, as a jury verdict, increased those damages from $8,000 to $500,000. And reducing that amount by the amount of the costs, the plaintiff would have experienced absolute breach. Now, he also was told in Blue Bonnet 5, at a minimum, jury verdict damages would be appropriate in this case. This court said, we reiterate the point we made in Blue Bonnet 3, that jury verdict damages would be appropriate in this case. Overall, he was told that through this process, he should make a fair and reasonable approximation of damages that would compensate the plaintiff for the net financial effect of the breach. That is precisely what he did. That is precisely what he said he did. As I mentioned, he reviewed all of the evidence from the 1999 trial. He received six additional days of expert testimony. Mr. Cohen says, well, we could have put on Mr. Fayol. Well, that overlooks the fact that the court said, after remand, what do the parties want to do? I would like your suggestions. Both the government and we said, there is no additional factual evidence that is required. We simply each want to submit expert testimony. The government is not in a position to claim that all of a sudden there should have been a retrial, because it wasn't. Now, he placed all of this evidence, the fact evidence from 1999, the expert testimony from 2005, into the context of this court's two prior opinions, as well as his own fact findings from the 1999 trial, which this court had affirmed. Now, he reaffirmed his own prior holding, that there is no doubt that the plaintiffs in this case were harmed. And he put himself in the position of a jury to arrive at a fair and reasonable approximation of plaintiff's damages. Using the jury verdict method, he calculated the word that he said himself expressly. Fairly compensated plaintiffs for the net financial effect of the breach, and not a penny more or less. That's what this court asked him to do. That's what he did. I would suggest that the jury verdict award is entitled to double-barreled deference. First, because the underlying fact findings are not clearly erroneous. And second, because Judge Pompei did not abuse the wide-ranging discretion that this court asked him to use in quantifying damages. Under these case-specific circumstances, the jury verdict award deserves to be affirmed. Any other result would really divest the trial court of what this court envisioned, that he would act as a proxy for a jury and as a fact finder. Instead, it would simply turn the trial court into a weigh station en route to this court for second-guessing of the damages amount. Now, the government really can't point to anything that resembles clear error or abuse of discretion. Despite the court's mandate that jury verdict damages would be appropriate in this case, they say, well, he forgot to apply the justifiable inability problem. Well, unfortunately, the justifiable inability problem doesn't have anything to do with the exercise that this court asked Judge Frute to conduct. There has never been any doubt in this case about what Plaintiff's actual breach-caused costs were. Justifiable inability pertains only to the actual cost component. That's what this court said in Blue Bonnet 3, 266 F. 3rd of 1358, when it said, even if Blue Bonnet had been justifiably unable to prove the cost of the EBA, but in fact they did. Now, Donko itself, 872 F. 2nd at 881, makes clear that justifiable inability has to do with actual costs. That's a case where there was going to be the grading of a plot of land this big, and then the contract was changed and it was half the size. And what happened was the contractor didn't keep track of his actual costs for grading this smaller plot of land. And what this court said was, you've got to show that there's some justification in not keeping track of the actual costs. Here, what this court said in Blue Bonnet 5 was, we know all about actual costs. That part's clear. What we need to do is offset but-for costs, if any. That was the exercise. There is no way with certainty, ever, to determine what costs would have been in a what-if, but-for world. That's why this court said to Judge Frute, use your intimate familiarity with the facts. You are closer to the facts than anyone. And help us wrestle with this complex question of what the but-for costs would have been. That's what he would have done. That's what he did that he was asked to do, and that's what he said he did. The government simply doesn't like how Judge Frute exercised his broad discretion in the context of his intimate familiarity with the facts. If the decimal point in this damages award had shifted just one place to the left, the government would have nothing but praise for the decisional process that Judge Frute used. But, of course, the test for firmness does not depend on the amount of the award. What the government said in its brief is Judge Frute expressly said, both in his original opinion and in his reconsideration opinion, that when Judge Frute said he relied on all the evidence, put himself in the position of a jury, and independently arrived at a jury verdict award, that means he relied on no evidence. Well, that's not only an inaccurate characterization of the facts. It really devalues what this Court correctly called Judge Frute's intimate familiarity with the facts. The way I would put it is what this Court wanted to buy and remand was Judge Frute's intimate familiarity with the facts and his best judgment. It said to him, please wrestle with this task. You're in the best position to do it. Come up with a number. He didn't. That's what this Court said. It's certainly what this Court meant. It deserves to be reaffirmed. This case has been under litigation for 11 years. You're speaking in bold strokes, which you're perfectly entitled to do, but I would be interested in your getting down to the nuts and bolts of questions such as the trial court's reliance, if the trial court did rely exclusively or in part, on the question of whether the regulators would have approved the failed loan transaction. I'm happy to address that. First of all, let me ask you this. Do you read the trial court's opinion as resting with respect to that issue exclusively on the regulatory prohibition, or do you understand that the regulatory prohibition issue to have been only one of the grounds on which the judge predicated his conclusion that a non-collateralized loan assumption would have occurred? First of all, it's quite clear Judge Frute said in his original opinion that he used the Shapiro model as corrected simply to facilitate. That's his own word. Simply to facilitate the jury verdict judgment. It was the government which then came back by way of reconsideration and said, no, no, no. Your award relies exclusively on this regulatory correction. Judge Frute said in his reconsideration opinion, without even waiting for a response from us, because he was confident that he knew precisely what he had done, that is not what I did. Now, if Your Honor, I can point you to where he said that it facilitated. I believe it's at page 242, 67, fed. 20. He says, to facilitate the analysis, the court adopts with one adjustment. But you needn't look any further than his valedictory statement, his conclusion. He says, I relied on everything. So I think it is the government's characterization, certainly, but not an accurate characterization, that the jury verdict award relies solely on the regulatory prohibition. Well, I'm addressing a narrower, I think, issue with my question. And that is, if you look at, well, it's actually A120, and this is, I guess, in one of the internet cop versions of the opinion, so I don't have before me the page of the Fed Claim Reporter, but on A120. The court is referring to Professor Shapiro's testimony and then says, and this is where the court gets into the 584.6a, would have kept CFSB from assuming any debt without prior approval from FHLBB. I guess we mean this there. There's no question, Your Honor. I'm sorry. Oh, okay. But the question that I have is, was this the exclusive ground on which the court was saying with respect to this issue that there would not have been such a transaction? That is to say, because it wouldn't have been approved. No, Your Honor. And I don't know how I can do better than to point to his reconsideration. Because the product of that discussion, which is that there would be a 16.1% equity surrender, is then reiterated by Judge Frute in his reconsideration where he says that the figures and percentages, this is in A122, the figures and percentages employed in the court's analysis, including the equity surrender portion, independently originated from a jury's assessment of the evidence presented. But let me play on that. Yeah, I guess I'm not – you seem to feel that that's absolutely conclusive. Maybe it is, but I'm maybe a little bit slow in picking up why it's conclusive. But I don't – I'm not sure I understand that to be addressed to the particular question that I'm trying to focus on. Well, let me try to meet your question by saying that the thrust of the jury verdict award is that damages are predicated upon a 16.1% equity surrender. Right, sure. What Judge Frute said was that results from my review of all of the evidence. If the award depended exclusively on regulatory correction, may I just address what the state of play was? Sure. Professor Calamiris in his opening testimony, his direct testimony, says there's no way that Professor Shapiro's model, which envisions a tax disadvantageous debt assumption. Right. So first of all, the transaction would never have been proposed. That's what Calamiris says. You're right. Now the question in my mind is does Judge Frute – you employ that – accept that and employ that as one of the grounds for his saying why the transaction wouldn't have occurred. That it would be tax disadvantageous? Well, or that there was any reason other than the regulatory prohibition. Yes, he does. He says it in footnote 83, which I think you'll find at page 120 in the Entity Census, where you're pointing. He says, for purposes of this analysis, the court accepts Professor Calamiris's creation of stone holdings in 1989 in a mechanical sense. That is a very important holding because what he's saying is we know. This is what Professor Calamiris testified to. We know that in the real world, Mr. Fayol never assigned his debt to a holding company because of the tax disadvantage of doing so until Stone Holdings was created. Here's Blue Bottom, Thrift. Above it is CFSB, the holding company. In 1997, Mr. Fayol created Stone Holdings as a new holding company above CFSB. In a tax-free exchange, Mr. Fayol had Stone Holdings assume his debt and also he gave his CFSB stock. It was an asset paired with a debt. It's an exchange of property, non-taxable, right? Exactly, and that's why the first point that's important about this is he's saying, I understand. Mr. Fayol would never even have proposed a tax-disadvantageous exchange of debt where he saddled CFSB with his debt before you get to the regulatory issue. That's why footnote 83 really frames what he was saying. He's saying, in essence, I accept for purposes of this correction that there has to be an asset paired with a debt. Now, that's important because we know also, and Professor Calamir has testified to this, that the regulators actually approved that transaction. The third piece that we know is what the regulations themselves said. Now, what Professor Calamir said is, I can tell you that when you saddle CFSB with this debt, its equity value plummets by 75%, and there's no way any regulator is going to let a regulated holding company do that. But that's as far as his talking about the regulations went. Professor Shapiro was then cross-examined by the regulations. He said, I don't know anything about this other than I'm sure the regulations would apply, and I'm sure there would be some way to come up with a tax-free exchange. Well, that still helps us. That is what Judge Foute adopted. Now, the third piece was the regulations mean what they mean. It is a matter of law. We briefed in our post-trial brief. The government said, no, no, we don't need to address the words and the language of the regulations. It's all really just a question of tax efficiency. Judge Foute then enters his judgment. The first time in reconsideration, they come forward and they say, no, no, that's not the plain meaning of the regulations. Here's what the plain meaning of the regulations is. Well, they waived that argument. You can't wait to the situation where you said to a trial judge, review all of the evidence, take all the submissions from the parties, use your best judgment, which is what he did. And then he did it on the basis of the record that was before him, and then the government for the first time in reconsideration says, I'm sorry, we want to come forward with this argument. But we're still right, even on the language of the regulations. The regulations would have prohibited that transfer because the regulations prohibited any transaction that would saddle a regulated holding company with an imprudent or unnecessary financial burden. Taking on additional debt without any additional income that plummets your equity value by 75% fails the regulations. And we have argued that in our brief. But I don't think the court even needs to reach that question because the government has waived that argument. Now, that was what was before Judge Foute. However you look at it, whether you look at it, as we say, holistically based on all the evidence, whether you look at it on what was before him at the time of the event of judgment, and whether you look at it on the basis of the government's untimely, as Judge Foute put it, belated motion for reconsideration, his award is supported across the board. It's what his board asked Judge Foute to do and it deserves to be upheld. Now, we have said in our cross-appeal that, sure, Judge Foute proceeded to a jury verdict analysis after he rejected Professor Calamiris' model, but he should not have rejected Professor Calamiris' model because the assumptions he rejected were based entirely on the law of this case. I understand, correct me if I'm wrong, just to be clear, that your cross-appeal is a conditional cross-appeal, right? It is conditional if this court affirms the jury verdict. Absolutely. If the court affirms the jury verdict award, you're not pressing your cross-appeal. Correct. Absolutely. To be perfectly clear. And just, I say it a lot of times, but to answer your court's question, because our cross-appeal seeks a modification of the judgment, we're comfortable not having a conditional cross-appeal. No, I'm not questioning its propriety. I'm just questioning whether you're asserting it regardless of the disposition there. No, we are not. All right. Okay. Thank you, Mr. Berger. Mr. Calamiris. In plaintiff's post-trial brief, they set forth this argument that no regulator would have approved the CFSB's assumption of the deadline was to fail. We responded by saying there's no competent evidence to that effect in the record. The plaintiffs included two sentences with respect to the regulation, 584.6. When the judge relied upon that regulation solely, we filed a motion for reconsideration. The judge didn't say he had waived the argument. He said it was belated. But he also accepted the argument because in his motion for reconsideration, he no longer relied upon the regulation. He said, I rely upon my view of the evidence as a whole. Now, with respect to the argument that this court mandated the use of a jury verdict without deciding whether or not the plaintiff's failure to comply to prove their damages was justifiable, this court in 2003 said specifically the jury verdict cannot be applied unless the plaintiff's failure to prove its damages is justifiable. With respect to the judge's holistic view of the record, in effect he's saying my judgment is unreviewable. I can choose an amount, $96 million, based upon my view of the record. I don't have to explain why. And as a consequence, it's impossible for us to show where he went wrong or for this court to review his judgment. And finally, and again we'd like to reiterate the fact that there's absolutely no evidence in the record that this regulation would have applied or the manner in which the regulators would have interpreted it. The court's judgment appears to be based solely upon this idea that it has complete discretion to pick any number that it wishes, and that cannot be the law, and the judgment should be reversed or remanded for entry of a judgment of $10 million. Could I ask you a question, Mr. Cohen, just on the mechanics of how the judge derived the particular number? It's a number with great specificity to it. It's not $96 million or $100 million. It's 96, 7, 98, 8, 42. Is there a spreadsheet anywhere, anything in the record that indicates arithmetically how one would come up with that number? As I recall, there is a demonstrative exhibit in the record that the plaintiffs produced that indicated the various damages. It's called their sensitivity analysis. But I don't have the citation. Let me ask a question this way. It's the same question. If I were to take the equity surrender number and reduce it from 49-whatever-it-was point something down to 16-whatever-it-was point something, would I come up with a number like this? Yes. Okay. Thank you. Thank you both, Mr. Cohen and Mr. Gregory. The case is taken under submission. The court is adjourned from today to today.